Good morning, Your Honor. Steve Biddle here, repairing for Greenbrier Rail Services. Keep your voice up, would you please, sir? Yes, I will. May it please the Court. Appellant, my client, Greenbrier Rail Services, is a company that in part repairs rail cars in about 20 facilities around the United States. One of those facilities is in Tucson, Arizona. The industry works like this. There's a grid of rail lines all around the United States, as you know. When a rail car needs to be fixed, the owner of the rail car determines where to send that car to be repaired. So it might send it to one of Greenbrier's 20 or so facilities, or it might send it to another company. And it depends on things like, you know, the grid logistics, where the car is located, cost, things like that. We had a hearing at the NLRB that lasted 20 days before an administrative law judge, and the evidence was uncontroverted in that hearing that Greenbrier, as the facility that repairs these cars, not the owner of the cars, has no ability to send the cars to a specific shop. So if the car is in Philadelphia, they can't send it to Tucson, et cetera. So generally, cars that are closer to the shops get sent to those shops by the car owner. And Greenbrier does not own the cars. In the Tucson shop, there had been a history of mounting financial losses in 2011 and especially in 2012. In October 2012, that shop alone lost $250,000. Was the shop profitable as a whole or not profitable as a whole? Not profitable as a whole for the period, most of the period. For what period are you defining? 2011, 2012. Over time, however, the shop had been profitable. It had before been profitable, correct. So if we looked at a longer period of time, we would see that it was profitable. That's right. And one of the things that happened was when the losses started mounting and compounding, really, they looked at the shop, management looked at the shop and said, we have to fix this, obviously. What should we do? And one of the things that was decided to do was to try to make the shop like it was before the losses happened. One of the things that concerns me about this case, it's in a, I'm not sure it's an unusual procedure or posture, but it comes up in a posture under which the district judge makes findings based on the transcript. And based on the transcript, I can see how the district judge could find that the closure of the plant was pretextual, because there was some testimony that supported that conclusion. The ALJ then completes his report and determines, as a matter of fact, that it wasn't pretextual. Correct. We're reviewing the district judge's ruling. What should we do? Should we ourselves look at the ALJ's ruling and say, well, it doesn't support what the district judge did? Should we send it back to the district judge to consider what the ALJ found? What should we do? Well, that's an excellent question. Give me an excellent answer. Yeah, I will. I'll try, Your Honor. It's a good question, because that's exactly our conundrum here, and our concern here, is that we have an ALJ who listened to 20 days of testimony, made credibility determinations, and the district court judge didn't hold a single hearing, even though the case law mandates that he hold a hearing here. But on our standard of review, how do we consider that? Because we're evaluating whether the district court, I guess, correctly anticipated what we would hold when we got to the merits of the case. So what weight do we give to the ALJ findings, given the standard of review here? Well, in our opinion, where a district judge, as in this case, ignores the record evidence and clearly mis- That's not the question. The question is, let's assume the district judge's decision was based on the record evidence, but as Judge Okuda just asked you, we now have something else. We have something new. What do we do? Well, the case law says that a case like this should be reviewed on a de novo basis, from a legal standpoint. So I believe- If we're reviewing the grant of a preliminary injunction, based on the idea that what would the board do and what would this court do as a likelihood, don't we review it under abuse of discretion? Well, the factual parts of the case should be reviewed on an abuse of discretion, correct. A factual issue? I'm sorry. Isn't pretext a factual issue? Pretext is a factual issue, but the way the law was applied was incorrect as well. What was wrong about the application of the law? There's so many facts in this case that, you know, there's a long factual and procedural history, as you know. But with regard to the closure, for instance, the ALJ found that it was clear that the decision of the large customer of Greenbrier, TTX, that had 82 percent of the work in Tucson, the decision of TTX not to send work there precipitated and motivated the closure decision. And that's what the ALJ found as well. So the judge's finding that the closure, for instance, was that the NLRB was likely to succeed on the merits of that argument was wrong. But doesn't that invoke our abuse of discretion law in Hinkson that factual questions, to be clear, error have to be determinations that have to be illogical, implausible or without support in the facts in the record? That's correct, Your Honor. It's abuse of discretion standard. Are you saying that the district court did not have facts in the record from which one could conclude pretext? I believe the district court abused its discretion by not having hearing, hearing evidence on its own, making credibility decisions. Some of the evidence that was considered and submitted to the district judge was otherwise admissible evidence, like affidavits. And so it was abuse of discretion to consider the evidence without the bigger picture of evidentiary standards. Let me try. I'm still not sure we've focused on the question I'm interested in. So let me try it slightly differently. Just assume for purposes of discussion that I think the district judge had the ALJ found there was pretext on exactly this record, that the district judge would not have abused his discretion. Correct. The ALJ found that there was not a pretext. But however, the district judge didn't have that in front of him. Is there something in our standard of review of this case that allows us to look at what the ALJ found? Judge Ikuda asked you before. We're supposed to predict what the court of appeals would do had the board granted this relief, which it hasn't done yet. So I'm trying to figure out how it is that the ALJ's ruling becomes relevant, because I must tell you from my own perspective, if all we had was the district judge's ruling and the ALJ had come out the same way, you'd be in big trouble. So see if you can help me and tell me how I use the ALJ's findings. Okay. I appreciate that. The ALJ went much more into depth than the district court judge. Now, let's assume that I think the ALJ's findings are supported by the record. Tell me how I can use them, because they weren't in front of the district judge. Well, what we have here is an injunction and a bargaining order. Those are extraordinary remedies, and they require certain elements. One of the elements of proof. One of them is a likelihood of success on the merits, balance of hardships, you know, all those things. If you look at the ALJ's decision, she goes into much detail about each of those things. No, I'm asking a procedure. I'm sorry. I don't want to interrupt you, but I'm asking a procedural question. Let's assume the ALJ was brilliant, wrote a wonderful ruling supported by the evidence. If the ALJ's ruling were in front of me, I could affirm it in a minute. It occurred after the order that you're now appealing. How do we take it into account? If a witness had recanted and you brought us up an affidavit today and said the key witness said she was lying, we wouldn't pay any attention to it. We'd tell you to bring it back to the district court. So how do we look at the ALJ's ruling? And I guess just to rephrase it another way, I mean, can we say that in evaluating whether the district court made a clear error of fact or abused its discretion under the Hinkson standard, can we look to subsequent findings by the ALJ to see if they shed light on what the district court did, or do we discount the ALJ's findings entirely? Well, I think the court's job here today is to determine whether the injunction was properly granted and is, because it's still in effect, is properly still in effect. How about answering the question about how we use the ALJ's finding? Okay. That's what I'm... Do we not use it? No preludes. Let's go to it. I think you have to use it. Now, that said, and so everyone knows, there are exceptions being filed by both sides with the National Labor Relations Board concerning the ALJ's decision, the portions that each side didn't win. So that's still, you know, the ALJ's decision is recommended. I was just going to ask you, if we use it, don't you lose on the bargaining order? The ALJ's decision is a recommended decision, and it's recommended to the board to adopt it, so we then file briefs and all that. So you think it's half brilliant? We think, we certainly think. Go ahead. If we put aside the ALJ's fact finding and just look at what the district court found, is it supportable under the preliminary injunction standard, under our standard of review, or is it not supportable even under that standard, putting aside the ALJ's findings entirely? Well, we don't think it's supportable putting aside the ALJ's findings entirely as we set forth in detail in our brief. So there is no evidence in the record from which a reasonable finder of fact could find that the closure of the plant was a pretext? That's correct. That's correct. Including the statements that you put on a witness to explain. That's right. The only evidence about the motivation for the closure was from two sources. One, the TTX executive who made the decision to stop sending 82% of the work or any work to Tucson. And number two, Greenbrier's management witnesses who made the decision, and they felt they were forced to make the decision because it was not sustainable to operate the Tucson. That's not entirely fair, is it? Wasn't there some testimony where somebody said you'll have only the union to blame for this? No, not regarding the closure. The closure came far after the election. The election was on July 11th. The closure decision was not made until the end of August, early September. And this was after the union had been soundly defeated. So why would the employer, how could it be pretextual? Why would the employer fire, in essence, close the shop and fire employees who voted 45 to 13 in its favor? The district court was looking at other factors, like it said, well, the facility has been profitable, has made some money every month. It said there were clients, even if TTX was gone, there were other clients that might send work there. What was wrong with those rulings? There's a basic misunderstanding from the district court judge, a factual misunderstanding, and that is that TTX is able to, excuse me, that Greenbrier is able to determine where rail cars are sent. That if TTX business goes away, that Greenbrier can still transfer other cars to Tucson, transfer other work to Tucson to be worked on. Greenbrier does not have that ability. That was uncontroverted in the testimony before the ALJ. What Greenbrier can do is attempt to attract business to Tucson, such as the brand, and I think prosper Pacer. That's right, Pacer and brand, that's right. And that's always been the case. The problem is the shop in Tucson was built as a TTX facility, repair facility. Different cars have different needs. For instance, there's tank cars. Tucson was never designed to be a tank car facility, could not have been retrofitted to be a tank car facility. That could have been a source of work. But the work that was coming there was... I don't want to interrupt you, but you've got two minutes left. Do you want to say anything? I would like to say something. Thank you. Good morning. Amy Ginn for the National Labor Relations Board. I'd like to begin by talking about the ALJ's finding on pretext. Under the abuse of discretion standard, this court can still find that the district court was correct in its assessment on likelihood of success on the merits of the Section 83 violation involving the plant closure. Well, I'm sure we could still find it. My question is what significance do we give to the ALJ's findings? Sure, Your Honor, and that's what I was... I mean, I suppose we could find the ALJ was wrong or we could ignore them, but... Sure. And let me ask the question again procedurally. We're supposed to predict what a panel of this court would do had the NLRB issued this order. And had the NLRB issued this order over the ALJ's finding that there was no pretext, I would be quite troubled. And so... Sure, Your Honor. Tell me how I use it. What I would say overall is this. The judge found that there was no pretext and thus no 83 violation. Which judge are you speaking of? I'm sorry, the administrative law judge, Your Honor. She found that there was no Section 83 violation because the closure was not discriminatory. However, she entered the same relief that the district court here granted as part of the injunction. And so in our view, if this court were to decide that the ALJ's finding was determinative on the likelihood of success of that violation, the same injunction is still appropriate. The district court did not abuse his discretion in entering that injunction because based on all of the other violations, including hallmark violations that the district court found likelihood of success on and that the judge found were committed, a Gissell bargaining order and plant restoration remedy was still appropriate. But aren't they quite separate remedies? There's other violations here in addition to this alleged pretextual closing of the plant. Absolutely. And can't the bargaining order lawfully be based on those other violations which both the district judge and the ALJ thought had occurred? Absolutely. So I'm not sure I follow your argument. Since she ordered bargaining, she must have also meant she couldn't. Oh, no. I'm sorry, Your Honor. That's not what I meant. Okay. Then I'm confused. What I meant to say is that from the board's point of view or the regional director's point of view in this situation, we do not need this court to affirm the district court judge on the sole finding of pretextual plant closure because even if that finding is not included in the district court's findings, there's still enough evidence here to support the injunction and the ultimate remedy. Okay. I'm talking about the part of the injunction of keeping the plant open. Correct. Okay. Doesn't there have to be some evidence that the closure of the plant was for an illegitimate purpose in order to keep it open? No, Your Honor. And I'll explain based on the administrative law judge's decision itself. In her decision, she said that a restoration remedy is required here because the company did not bargain with the union over the plant closure. Isn't that a very unusual order? If all there is is refusal to bargain, why isn't back pay and reinstatement the adequate remedy? And could you also address first maintenance and Dorsey trailers in those cases that say you don't have to bargain when it's a legitimate economic reason? Sure. And I think that I might actually start there. And that's Judge Acuda's asking in a better way the question that I tried to ask. Okay. So with respect to, for example, to first national maintenance, in that case the court itself said that's a situation where you have a company going out of business, changing the nature of its business, there's no bargaining obligation except for effects bargaining. In first national maintenance itself, the court pointed out, though, that in the situation of a relocation of work, which is what this was, the work that was done at the Tucson plant didn't evaporate. The work is still being done by GRS. It's just being done elsewhere. But you're assuming that GRS can direct the work, that the work is not directed by the customer. The underlying Section 885 violation for failure to bargain over plant closure is the idea that labor cost concessions could have had a factor in the ultimate decision. And so here there's no question that labor costs were part of the decision-making involving the Tucson facility. There is a factor of raising rates, and that that was tied to labor efficiency and tied to labor costs. And so where there is a situation that there could be concessions made, labor concessions made in bargaining that could make a difference in relocation of work, then you have an obligation to bargain over that relocation. You're assuming relocation of work is at the option of GRS. The closure of the facility was at the option of GRS because there were additional customers. They might lose the customers if they close Tucson, correct? I'm sorry? They might lose the customers if they close Tucson. They can't tell TTX where to have it. They cannot tell TTX where to send its rail cars, correct. But they have other companies who not just potentially could send cars. They had other companies already sending cars to Tucson, I guess. But let's assume, I think, and there's no finding to the contrary, either by the district judge or the ALJ, that TTX made a business decision not to send cars to Tucson. Is that fair? That that was. There's no evidence that TTX conspired with Gunderson to. Correct. And so TTX says we're not going to send our cars to Tucson anymore, and that's 80 percent or something of Tucson's, some very large percentage of Tucson's business. Why isn't it just a business decision at that point to say we've got a lot of other facilities and our business is going there, we'll transfer our employees to those other facilities? What in the record supports that keeping it, that there isn't a legitimate business reason at that point to close the facility once TTX has decided not to send its cars there? Sure. And so there are two different sort of evaluations of that evidence here. We have the district court's evaluation of the evidence, which is that there was pretext that it wasn't a legitimate business decision because of the reasons the district court relied on. Then you have the administrative law judge saying it was a legitimate business decision to close at that point, so it wasn't a discriminatory closure. However, the judge also says, though, that under Section 8A.5, there was an obligation to bargain over that decision, and that that violation of the act is enough to require a restoration remedy. Well, is it in light of the question Judge Ikuda asked you, which is that the evidence is that this facility is not profitable, absent something new happening at this point, attracting customers, which is pretty speculative. Why isn't this extraordinary remedy a bit too much as opposed to just the bargaining order? Well, one of the things that the administrative law judge discussed is that there wasn't enough evidence of harm to the employer to reopen the facility. Let me interrupt you for a second. Let's talk about comparative harm. If the factory or the Tucson facility remains open and everybody is twiddling their thumbs but getting paid, and ultimately the board says that remedy was too much, what chance does GRS have of recovering the wages paid those people during the time they were twiddling their thumbs? Your Honor, actually. None, right? Okay. Now, do it the other way around. If there's a back pay order, the men, if they're entitled to back pay, will get that money. So why isn't the comparison of loss which cannot be recovered by the employer and loss which will be recovered by the employee tend to show that back pay is a sufficient traditional remedy? The district court in his order, I think, addressed your concern, Your Honor, by limiting the injunction here to reopening the facility and employing those employees that there was enough work to employ. So instead of just saying you have to reopen and bring back on all of your employees when you don't have any work for them, the district court took into account the fact that the employer would need to attract business, may need time to get customers to come back and said, look, bring back the amount of employees that you have work for and then bargain with the union to create a preferential hiring list to bring back additional employees as work allows. But as to all of those employees, the ones employed and the ones who might be called back, why isn't back pay a sufficient remedy? The reason that back pay is not sufficient here is that we have not only an injury to individual employees, we have an injury to the collective bargaining process and employee statutory rights. And those are all things that the district court took into account here and that this court has taken into account in looking at tensions. But does the bargaining order, let's assume the bargaining order is solid, doesn't the bargaining order address those concerns sufficiently? When the board enters a bargaining order, or here where we have a bargaining order in place right now under an injunction, the board can't grant retroactive relief for whatever the employees may have gained from bargaining had it occurred from the time of majority support when the company began its campaign of unfair labor practices. And that's something that's been recognized in several cases involving 10J bargaining orders, including the Stephen Dunn case in this court. But they could bargain about back pay. They could bargain about reinstatement in other facilities. They could bargain about severance pay. So clearly that there was an area for bargaining if the bargaining order was legitimately issued. And it seems that you're assuming that GRS had an obligation to bargain over closure, which seems uncertain. It seems unclear. The district court judge found that there was an obligation to bargain over the closure, and the administrative law judge found the same thing. It was based on, when I was looking at the district court's reasoning, it was saying things like, well, GRS is a big facility with a lot of revenues, so therefore the balance of equities makes it fair for GRS to have to reopen a facility that not only closed but apparently had disassembled and had removed the material. So it wasn't clear to me about the balance of equities point. Maybe you could address that. Sure. I believe actually that the administrative law judge looked at that, at the size of GRS, as a factor in looking at whether there would be an undue burden on the company. So are we looking at the ALJ's order? I mean, that was the question we initially asked GRS. Should that affect our analysis here? I think that the ALJ's order bolsters in many ways the district court's findings, and it also provides a guide for this court as to the likelihood of success. Put aside whether it helps you or helps him. How do we look at it? How do we use it? I would say overall that the administrative law judge's decision is extremely helpful. Let me accept your premise that it's helpful to you. Procedurally, how do we use it? Do we use it? I mean, it wasn't in front of the district judge. It's hard to say the district judge either abused his discretion or didn't abuse his discretion by not knowing what the ALJ would find several months after he made his ruling. So my question is, how does this group of three people use that ALJ decision? We'll figure out whether it helps you or helps him. How do we use it? Okay. I would say that here, because on the issue of pretext in particular, which is where the ALJ diverged from the district court, I would say that while I do not think that the judge's credibility findings on that point are enough for this court to say that the district court abused its discretion in finding likelihood of success on the merits of that violation, I do think that given that the judge's decision was somewhat based on credibility determinations, which are the sole province of the judge, it would not be wrong for this court to look at that and say, okay, we now think that there is not a likelihood of success on that violation. So your view is that we can use the ALJ decision in order to determine what? Whether the district judge abused his discretion or whether or not we would be likely, in the event of an eventual appeal from the NLRB's action, to affirm or reverse. The second one, Your Honor. The second. The second one. Thank you. Sure. I'm sorry it took so long to get that. No, no. It's an unusual question, and it's an unusual situation for us, so that's why I'm asking it. Sure. I would say, again, overall, that here the district court did not abuse its discretion in entering this injunction, both because of the nature and number of violations involved and also because, again, the irreparable injury to the collective bargaining process employs statutory rights and the board's ultimate remedial authority, which are all factors that need to be addressed in looking at whether this relief was warranted. If there are no further questions. Thank you. I just want to make two points, hopefully answering your questions this time better. The first point is, procedurally, the question was procedurally, how do we use the ALJ's order? Yeah. Good or bad? That's right. That's right. How do I look at it and then justify that I've looked at it? This is an unusual procedural situation. The district court's order, it seems to me, was an unusual procedure. It was meant to be a temporary fix, a temporary thing. It was called a petition for temporary injunction, for instance. And it was supposed to be until the NLRB weighed in on this, on the actual evidence and the actual hearing. We have that now. And the NLRB actually filed the ALJ's decision in July with this court. So the court has that. So I think you should use it. But apparently, aren't we supposed to assume that since the NLRB would give the same relief here? Well, and that goes to the second point I wanted to make, and that's exactly right. There's two things here. There's the injunction and the bargaining order. With regard to the injunction, clearly back pay, reinstatement, traditional board remedies apply here and can be applied here. Number two, the bargaining order, why couldn't a new election be held to determine if employees really want to be represented? They've had two elections. They've twice denied that they wanted to be represented by a union. Why not have a new election? That's a less ñ a bargaining order and an injunction together, the issuance of both of those, is very unusual and extraordinary. And it's not necessary in this case when you have adequate other remedies to fix whatever might have happened. I have one other question to you not related to what we've asked before. The injunction tells you to keep the plant open, keep employing people, and also not to sell off the assets. There's nothing in your brief directed to that last part, selling off the assets. Is that ñ do you challenge that part of the injunction? Well, the idea was what do we do with this shop, and selling the assets was not really ñ it was something that was going to happen because this shop was closing. What actually happened was truckloads of these ñ of the assets, which are equipment, welders, things like that, went to other shops for the most part, were sent to Mira Loma, California, San Antonio. Sorry, but can you answer my question, yes or no? Do you challenge that part of the injunction? Yes. There's nothing in your brief challenging it. Well, we challenge the whole decision with regard to reopening because there's no basis for it. Okay. Thank you. Thank you very much.
judges: BEA, IKUTA, HURWITZ